The opinion of the court was delivered by
Breaux, J.
The plaintiff claims damages for the alleged killing of his son, James Dixon.
The decedent was a night inspector, and had charge of a district or route, and his duty was to repair lamps at lighting points and inspect electric lights.
It devolved upon him during the night to telephone to the clerk at the plant and receive or convey information about the' electric current and the arc lights.
On the night of the accident the last telephone message received from James Dixon was at 3:05 a. m. He was at the time a considerable distance from the place of the accident, at the corner of Broadway and Felicia streets, where his body was found on the morning of July 11, 1889. He was lying on his back in a gutter on the north side of Broadway street.
The arc lamp had been lowered to within a few feet of the ground, the hood of the lamp taken off and placed a short distance in the street. There was an insulating stool or board, used to stand on while repairing a lamp, which had been evidently placed there by the late James Dixon, and on which, in all probability, he stood part of the time at least. He was at work endeavoring to repair the lamp from a position not under the lamp, as testified by some of the witnesses, but on the side nearly under the lamp. The body when found was in an opposite direction; that is, the lamp was between the body and the insulating board.
We are clearly of the opinion that the death was caused by an electric shock.
The cut-off screw on the side opposite to that near which the insulating board was standing was out of order; it was burnt out. This cut-off screw was on the side the body was lying, giving rise to the inference urged on the part of defendant, that Dixon must have taken the hood off, placed it on the ground, and commenced to work *1149 on the screw from the ground, without standing on the insulating plaintiff’s board.
Plaintiff’s counsel controvert this inference, and urge that Dixon might have received the fatal shock before discovering that the cutoff screw was out of order, or that there is probability that he unscrewed the hood and pitched it along the ground without getting off his board, and went on with his work; that the lamp was a swinging lamp, and if the cut-off screw was on the other side of the lamp from the insulating board, Dixon might have swung the lamp around so as to get at the cut-off screw; or he might have been adjusting another part of the lamp.
These grounds urged by the plaintiff, are not sustained by the testimony.
Only one witness, a little girl eleven years of age, testified that she was present and witnessed the accident. She was carrying .milk from her father’s house to a neighbor.
The District Judge says: “No one saw the deceased when he was hilled. There is no proof as to whether he was standing on the stool or on the ground when he met his death.
“ Circumstantial evidence leads the court to the 'conelusion that the deceased was standing on the ground at the time, attempting to repair a defective lamp.
“ One witness, a girl, at the time of the accident twelve or thirteen years old, testified, three and a half years after, that she saw the deceased at the time he was killed, and that he was standing on the stool, with his hands above his head, fixing the lamp.
“The jury evidently did not credit her story. The court attributes her testimony, among other reasons, to her childish imagination, and considers she related not what she did see, but what •she imagined she had seen.”
The witness testified in the presence of the District Judge and the jury.
Under the jurisprudence well settled on that subject, and in view of the facts, we must give weight to the opinion expressed by the District Judge. Moreover, the record does not disclose that her testimony was uncontradicted and consistent. With reference to the time he was killed, this plaintiff’s witness would fix it after sunrise, while the defendants’ witnesses testify that there was no current on the lines after daylight.
*1150 Her testimony regarding the height of the lamp from the ground does not agree with the testimony of other witnesses. The account-given of the fall at the time of the fatal shock is not, we must say, convincing.
We have given due consideration to her testimony. The view we have taken of it is not in the least unfavorable to the witness.
She was a mere child at the time, and her statement many years after the death as a witness, can not under the circumstances be taken as a basis for a judgment.
Other evidence discloses that it was not possible for James Dixon to stand on the insulating board, as before described, and receive a fatal electric shock, judging from the position his body was found. Scientific experts in electricity testified that in wet weather the insulating stool was not safe to be put down anywhere in the street so that a man could safely handle and operate wire at a line or point not properly insulated, carrying three thousand volts.
The record discloses that no rain fell between July 14 and 17r 1889.
The preponderance of the testimony shows that the insulating board was in good condition, and not sufficiently wet to convey current enough to the top of the board to give anybody a dangerous shock.
It is in evidence that Dixon understood the danger attending the work of a night inspector; that he was warned of that danger; that he had charge of the insulating board, and that it devolved upon him to place it in a safe position. It is well settled that the servant' assumes the risk if he knows the danger of his employment. Bailey, Master’s Liability and Injuries to Servant, p. 146.
One of plaintiff’s charges was that the current of electricity over and through defendant’s wires was of such intensity and volume as to be dangerous to human life.
The evidence is that the voltage of the circuit was about three thousand, and that there were between eighty and ninety lamps on the circuit, and that it is not practical to use a short circuit and low voltages. It is not done anywhere, and is not considered good electrical engineering.
We do not discover here that there was anything exceptional in the number of lamps put upon the arc light circuit using a direct current, or in the tension of the current.
*1151 The board to stand on was such as is ordinarily used, and is still in use.
If Dixon was standing on the ground, or if he was not careful in the use of the insulating board, his sad fate and untimely end are not causes of action for which the defendant can be held.
The case was tried the first time before a jury. They having failed to agree, the prayer for trial by jury was withdrawn, and the case was decided by the court without the intervention of a jury.
Plaintiff’s demand was rejected. He appealed.
It is ordered, adjudged and decreed that the judgment appealed from is affirmed at appellant’s costs.